UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STAR OF THE WEST MILLING
COMPANY,

               Plaintiff/Counter Defendant,            Case No. 15-cv-13086

v                                         Honorable Thomas L. Ludington

HARTWICK SALES AND SERVICE
LIMITED,

               Defendant/Counter Claimant.
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AS TO LIABILITY AND PARTIAL DAMAGES AND CONFIRMING
CASE MANAGEMENT DATES**

In November of 2013 Plaintiff and Counter Defendant Star of the West Milling Company ("Star") entered into a purchase agreement with Defendant and Counter Plaintiff Hartwick Sales and Services Limited ("Hartwick"), whereby Star agreed to purchase a robotic bagging and palletizing system designed by Hartwick (the "System") for a total purchase price of $617,873.00. Pursuant to the agreement, the system was to bag Star's wheat, bran, and flour product at a rate of 10 bags per minute. *See* Purchase Agreement, ECF No. 1. Ex. A.

After the System was installed in February of 2015, Star informed Hartwick that it was experiencing numerous problems, including the System's inability to bag product at the specified rate. Star accordingly withheld the final payment. After providing Hartwick with an opportunity to cure the defects, Star attempted to revoke the agreement by letter dated May 15, 2015. Star then filed suit against Hartwick in Saginaw County Circuit Court in the State of Michigan on July 29, 2015, alleging the following four counts: (1) Breach of Contract; (2) Revocation of the agreement; (3) Breach of express warranties regarding packing rate and performance; and (4)

Breach of the implied warranties of merchantability and fitness for a particular purpose. *See* Compl. ECF No. 1. Ex. 1.

Defendant Hartwick removed the action to this Court on August 31, 2015 asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332. Hartwick then filed an answer along with the following counterclaims: (1) Breach of contract based on Star's failure to furnish Hartwick with the final payment; (2) Quantum meruit; and (3) Unjust Enrichment. *See* Answer & Countercl., ECF No. 2. After the close of discovery, on April 15, 2016 Plaintiff Star moved for summary judgment on all claims. *See* Mot. for Summ. J., ECF No. 12. For the reasons stated below, Star's motion for summary judgment will be granted.

## I.

Plaintiff Star, a Michigan Corporation located in Frankenmuth, is in the business of milling, processing, and packaging flour and other agricultural products for sale. *See* Compl. ¶ 7. Defendant Hartwick, a Canadian Corporation located in Strathroy, Ontario, specializes in manufacturing packaging equipment, including equipment that packages, palletizes, fills, closes, and otherwise handles bagging for commercial clients. *See* B. Hartwick Aff. ¶ 2, ECF No. 14 Ex. 2; B. Hartwick Dep. 7; ECF No. 15 Ex. 3. Brothers Brian Hartwick and Vaughan Hartwick are equal owners of Hartwick, and Hartwick has a total of eight employees. *See* B. Hartwick Dep. 9-10.

## A.

In 2012, Plaintiff decided to replace its existing, labor-intensive packing system with a fully automated, robotic system. *See* Fassezke Aff. ¶ 5, ECF No. 12 Ex. 1. Star sought to install a system that could pack 50 pound bags with flour and bran at a rate of 10 bags per minute. *Id.* at ¶ 6; *See* B. Hartwick Dep. 26-27. In the fall of 2012 Star entered into discussions with

Hartwick regarding the design and implementation of such a system. Fassezke Aff. ¶ 7. The parties had previously worked together on a different project. *Id.* Around that time Hartwick was working on a similar system for a different client for the purpose of bagging soybeans (the "Jackson Machine"). Although Hartwick had previously *sold* similar systems for the purpose of bagging flour, Hartwick had not itself *built* a system for such a purpose. *See* B. Hartwick Dep. 14.

On November 22, 2013 Defendant Hartwick provided Plaintiff Star with a quote for the System. *See* Quote #6700, ECF No. 14 Ex. 5. The System was to be made up of numerous components, including a bag placer, a palletizer, and a wrapper. *Id.* at pp. 30-31. The wrapper was to be built by a third party, and then connected to the System by Hartwick. *See* B. Hartwick Dep. at 42. According to the quote, the bag placer would be capable of filling 10 bags per minute using bags ranging from 12 to 24 inches wide and 20 to 24 inches long. *See* Quote # 6700 at 1. The bag placer, together with a net weight dosing system, was to ensure that each bag was filled within 3 to 4 ounces of the desired weight of 50 pounds. *Id.* at 5. The completed System price for the System was quoted at $617,873.00. *Id.* at 31. The quote further contained the following agreement:

> It is understood by all parties that the system described above must meet the performance as listed above. As well the system must run as well or better than existing equipment in the same price range. If not we (Hartwick System) will remove the system and return all funds paid. The wrapper is not included in this performance clause.

*Id.* at 32. The quote also contained a price schedule under which Star would tender 40 percent of the purchase price as a down payment ($247,149.20), 50 percent of the purchase price upon shipping ($308,936.50), and 10 percent of the purchase price thirty days after installation

($61,787.30). *Id*. Star accepted the quote, and the parties entered into a purchase agreement at some time in November of 2013.

## B.

Hartwick initially believed that it would take around six months to build the System for installation at Star's Frankenmuth facility. *See* Mot. for Summ. J., Ex. 7. However, designing and constructing the machine took Hartwick longer than anticipated, and by June of 2014 the System was only partially completed. *See* B. Hartwick Dep. 50-52. The parties then set a new installation date of August 4, 2014, which again had to be extended due to delays in the system's construction. *Id*. at 53. These early delays were not problematic for Star, as Star had yet to complete the warehouse that was to house the system during the installation period. *Id*. at 54.

Hartwick began testing the Jackson Machine – not the System ultimately intended for Star's Frankenmuth facility – one bag at a time with 100 pounds of flour purchased from a local mill. *See* B. Hartwick Dep. 59, 74. After this initial testing, Hartwick determined that the bags Star had provided were too small to hold the desired weight of 50 pounds. *Id*. at 60-61. Hartwick thus requested larger bags from Star, along with representative samples of the products it intended to use with the System from lightest to heaviest. *See* B. Hartwick Dep. 56, 74-75. Star accordingly sent three tons of product on October 2, 2014, consisting of heavy bran, light bran, cracked wheat, and flour. *See* Mot. for Summ. J., Ex. 8. Pointing out that unbleached flour is heavier than bleached flour, Hartwick suggests that Star only sent one type of flour as part of its representative samples. *Id*. at 74-79. During his deposition, however, Brian Hartwick stated that he had no idea what kind of flour Star sent that he then tested on the Jackson system. *Id*. at 79.

- 4 -

By an email dated October 31, 2014, Brian Hartwick informed Star that he had received the new bags and that "they look like they will do the job." *See* Mot. for Summ. J., Ex. 9. Brian Hartwick also informed Star that speed tests on the system were going well, and that he expected it to operate at 11.5 to 12 bags of flour per minute. *Id*.

On November 12, 2014 a Star employee emailed Brian Hartwick for an update, stating that Star had not heard anything about the System in some time. Brian Hartwick responded on November 14, 2014, stating: "Hi everyone  Update on the bag  We tested the new bag it worked well . So we do not see any issues with this bag." *See* Mot. for Summ. J. Ex. 10 (sics in original). As to the System's speed, Brian Hartwick stated that the System could meet or exceed the goal of 10 bags per minute, but that speeds would vary based on product with the bran being the slowest. *Id*. He cautioned that Hartwick was having some issues testing product on the Jackson Machine because the auger system that fed that machine was not designed for flour. *Id*. at 90. He also stated that the present conveying system could only run one bag at a time, so he could only guess at the weight, and that it was taking a long time to test each bag. *Id*. at 91. Brian Hartwick also informed Star that Hartwick would run a full test on Star's System before the holidays. *Id*. at 90.  As of November 14, 2014, Hartwick had only tested Star's product on the Jackson Machine, and had not tested the product on the System intended for Star, as that System had not yet been completed. *See* B. Hartwick Dep. 87-88.

Hartwick completed assembly of the System sometime in November or December. *See Id*. at 94. Hartwick then disassembled the System to have it painted. *Id.*  In an email dated December 24, 2014, Brian Hartwick informed Star that the System would be ready to view in the first week of January. *Id*. Star responded on January 5, 2015 and asked when it could visit Hartwick's facility to see the full System running. *Id.* Brian Hartwick replied that he planned on

testing the System later the next week, and that he would send Star an update in the near future to schedule a time. *Id*. After again receiving inquiries from Star on January 12, 2015, Brian Hartwick responded that Hartwick would run tests on the System from January 20, 2015 to February 9, 2015. *Id*. at 96. The parties then agreed that Star representatives would visit Hartwick's facility on Friday, January 23, 2015 to view the tests. *Id*. at 98.

On January 22, 2015, however, Hartwick emailed Star to inform it that the site visit had to be delayed because Hartwick would not be in a position to run 20 bags continuously. *See* Mot. for Summ. J. ECF No. 11. Hartwick explained that a motor was overloading, and that it would take most of the morning to fix. *Id*. The next day, January 23, 2015, Hartwick informed Star that it had a permanent solution to the problem. *Id*.  Hartwick also requested an additional 2000 pounds of flour for testing.  *Id*. Hartwick concluded with a request that the site visit be rescheduled for the following Wednesday. *Id*. Star accepted and on January 28, 2015 Jeff Trudel, a Star representative, visited Hartwick for four to five hours. *See* Mot. for Summ. J. Ex. 12; B. Hartwick Dep. 102. During Mr. Trudel's visit, Brian Hartwick and Vaughan Hartwick ran flour and bran through the System. *See* B. Hartwick Dep. 103.  At the time, Hartwick could only run two or three bags in a row due to limited bin space. *Id*. at 105.

While Hartwick was able to test the System at ten cycles per minute during dry runs (without any product), Hartwick was never able to test the System at full speed with product. *Id*. at 106. As of January 29, 2015 the System was still experiencing some dusting issues with Star's products. *Id*. at 107.

### C.

On February 16, 2015 Hartwick began installing the System at Star's Frankenmuth location.  *See* B. Hartwick dep. 108. The installation was originally scheduled to take two weeks,

and Star had only stockpiled two weeks' worth of product to fulfill customer orders during that time. *Id.* at 111-12. However, six weeks later Hartwick was still at Star's Frankenmuth location working on the system. *Id.* While the system was technically operable after two weeks, there were numerous issues that significantly affected the system's performance. The System performed particularly poorly when processing flour. Brian Hartwick testified that, while the system occasionally worked when processing Star's unbleached flour, the system did not work at all when processing Star's bleached flour. *Id.* at 118. All in all, none of Star's flour processed through the system at a satisfactory rate. *Id.* Brian Hartwick testified that he believed the flour Star had provided to him for testing purposes was different than both the bleached and unbleached flour that actually came out of Star's mill. *Id.* at 117. Brian Hartwick never ran any tests to confirm his belief that the flours were different. *Id.* at 119.

On March 20, 2015 Michael Fassezke, the vice president of Star's flour milling division, catalogued the system's apparent shortcomings in a letter to Brian Hartwick as follows:

1.  The bag weights were promised to be within a tolerance of 3 to 4 oz. per 50 pound package. We are not even close to this goal.

2.  Considerable dusting is occurring during the fill sequence of the bag. There has been no improvement on this issue since the initial startup.

3.  We have had multiple failures with equipment fixtures requiring suction. This results in bags not being placed into the packing system and held in the system properly for filling.

4.  Bags routinely do not seal because of the orientation of the bag in the heat sealer. This has been an ongoing and significant failure in the system. As you already know, we have on order additional bags of flour that are slightly longer and also a test run of flour bags that will be slightly wider to provide additional head room in the bag as it goes through the heat sealer. Unfortunately, these larger bags are at least 8 weeks from delivery.

5.  One of the Motoman robot[s] has already failed and had to be replaced. Hartwick Sales replaced this equipment in a timely manner. Unfortunately, many of the other components throughout the entire system

have also failed.  This does not give us much confidence in regard to the long term reliability of the system.

6. The conveyor system leading up to the date coder and metal detector routinely leads to bag jams under the date coder.  Not sure why this should be happening.

7. Pack rates remain in the 4-5 bag per minute range.  Rates of 10 bags per minute were indicated in our contract and are expected.

8. Requirements for electrical connections were not clearly spelled out and were apparently understated which resulted in significant additional cost to Star of the West.

*See* Mot. for Summ. J., Ex. 13.  Mr. Fassezke further stated that, while Star was not currently in a position to give up on the process, he would continue to provide Hartwick with written weekly updates.

Mr. Fassezke provided his next written update on March 26, 2015.  *See* Mot. for Summ. J. Ex. 14.  Noting that installation had started 38 days ago, Mr. Fassezke stated that Star had "seen no improvement in system overall, and nearly all of the ongoing issues noted in last week's letter have not been resolved." *Id.*  Specifically, Mr. Fassezke noted that the bag weights continued to deviate beyond the amounts specified in the contract, and no improvement had been made to the dusting issues. *Id.*  Mr. Fassezke further set forth seven separate equipment failures, and an instance in which the "recipe" for packing light bran was erased from the system. *Id.*

On April 6, 2015 Mr. Fassezke provided his third written update. *See* Mot. for Summ. J., Ex. 15.  Mr. Fassezke first reported that Star had received two customer complaints regarding short weights, and at least one complaint regarding illegible or non-existent code dates on the package. *Id.*  Mr. Fassezke then catalogued the following list of continuing problems:

1. The bag weights continue to deviate dramatically beyond what was specified in our agreement.  As I already mentioned, we received two additional complaint[s] regarding short weights this past week.

- 8 -

2.  No improvement has been made on the dusting issue during filling.

3.  When packing flour, we have sporadic and ongoing issues getting a good seal
    on the bags.  I know that [you] have advised us to go to a larger bag, which we
    have on order.  As you know, lead time for bags is at least eight weeks.
    What's interesting is that it doesn't happen all the time and with one flour
    product (Softex) it rarely happens.  Yet the Softex bag is the same dimensions
    as our other flour bags.  The real issue here is variability within the system!
    This system must work all the time and every time for us to realize any returns
    on our investment.

4.  Pack rates continue to be dramatically below what is specified in our
    agreement.  Currently, we are packing approximately 3 bags per minute on
    flour and 5 bags per minute on bran products.  Our agreement specifies 10
    bags per minute for both products.  This has not improved at all since we
    attempted to start up the system.  We have actually gotten nearly caught up
    with our orders, but we have had to work around the clock to get this done.
    This was not an intended aspect of putting in a new packing system.

5.  We continue to have recurring and new mechanical failures.

…

*Id*.  Mr. Fassezke then stated that Star was concerned that the mechanical problems suggested
that the machine may not be reliable in the long-term. *Id*.  Noting that Star was "getting
frustrated and our costs are mounting[]", Mr. Fassezke directed that Star needed "to see
improvement on an ongoing basis." *Id*.

Mr. Fassezke's fourth written update sent on April 13, 2015 noted "some improvement
regarding our packing rate and dust control at the packer head." *See* Mot. for Summ. J., Ex. 16.
However, Mr. Fassezke noted that Star continued to receive customer complaints regarding short
weights. *Id*.  He also noted issues with getting a consistent seal, as well as continuing mechanical
failures. *Id*.  Mr. Fassezke also noted that, while the packing rate had improved slightly, it still
remained "dramatically short of the 10 bags per minute that is specified in our sales agreement."
*Id*.

Mr. Fassezke's fifth written update followed a week's worth of continuing System issues. *See* Mot. for Summ. J. Ex. 17-19.   Observing that it had been 63 days since installation commenced, Mr. Fassezke stated that Star continued to experience "both chronic and novel system failures in regard to the system. *See* Mot. for Summ. J. Ex. 20.   In addition to other problems, Star continued to experience product dusting, the bags continued to "log jam" at the bag pusher step, and the cycle rate remained significantly below 10 bags per minute. *Id*.

By May 15, 2015 Star had run out of patience with the System's lack of progress.   On that date Mr. Fassezke sent Brian Hartwick a letter stating that, "[w]hile we have seen some limited improvement in the operations of the system, it has not, and may not ever perform as indicated in our original purchase agreement." *See* Compl. Ex. B.   After setting forth the System's history of performance issues and mechanical failures, together with the additional costs incurred by Star as a result, Mr. Fassezke stated the following:

> Based on our dissatisfaction of the packing system and a complete failure to meet expectations outlined in the purchase agreement, we are requesting that you remove all of the equipment comprising the packing system installed by Hartwick Sales in February 2015 and refund all moneys paid to Hartwick Sales as payment for this packing system.  We are willing to work with you regarding the timing of equipment removal and the refund due Star of the West Milling Company.
>
> We are disappointed in the outcome of this project, but we see no other realistic option available to our business.

*Id*.

Instead of removing the system and refunding Star's money as requested, Justin Hartwick proposed a series of 15 "final upgrades" in late June and early July. *See* Mot. for Summ. J. Ex. 24-25.   A number of the proposed upgrades were aimed at replacing the defective hoppers, which had not allowed the flour or bran to flow properly and which Hartwick acknowledged had caused "major issues." *Id*.   Other proposed upgrades were aimed at again improving the bag

clamps.  Hartwick also repeated a previous recommendation that larger bags be used for the flour product. *Id*. In answering Star's question of why the proposed upgrades had not previously been implemented, Justin Hartwick said only that "[w]e do only have so many resources and to be completely honest we got ourselves so far behind with this project we are only now getting things back to normal." *Id*.

Star declined Hartwick's request to make the proposed modifications. *See* Fassezke Aff ¶ 18; B. Hartwick Dep. ¶ 9. Instead, around this time, Star decided to buy a replacement packing machine from a different company. In the meantime, the evidence suggests that Star continued to utilize the System to bag its products. Star also followed Hartwick's recommendation of ordering larger flour bags at some time in July.

**D.**

On July 29, 2015 Star filed suit against Hartwick in Michigan State Court in Saginaw County, alleging the following four counts arising out of the parties' purchase agreement: (1) Breach of Contract; (2) Revocation of the agreement; (3) Breach of express warranties regarding packing rate and performance; and (4) Breach of the implied warranties of merchantability and fitness for a particular purpose.[1] *See* Compl. ECF No. 1. Ex. 1. Defendant timely removed the action to this Court on August 31, 2015, and asserted the following three counterclaims: (1) Breach of contract based on Star's failure to furnish Hartwick with the final payment; (2) Quantum meruit; and (3) Unjust Enrichment. *See* Answer & Countercl., ECF No. 2.

Even after the lawsuit was filed, Hartwick continued to tinker with the System design at its Canadian location. As of September 17, 2015, Hartwick only reached a bagging rate of 5.5 bags per minute. *See* Mot. for Summ. J. Ex. 26. On October 16, 2015 Star sent Harwick a letter

---

[1] In most cases, breach of express and implied warranty claims are pled to form a basis for a breach of contract claim.  Here Plaintiff has pled each claim separately, and the claims will therefore be addressed separately in this opinion.

stating that it intended to remove the System in the coming months and that Hartwick would have an opportunity to operate the System before it was removed. *See* Mot. for Summ. J. Ex. 27. Star also informed Hartwick that it had obtained larger bags that would be available for Hartwick's use.

Hartwick alleges that, despite the alleged revocation, Star continues to use the System to this day, and that Star has demanded technical support from Hartwick as recently as March 22, 2016. Hartwick has presented no evidence it has been prevented from removing the System from the Frankenmuth location, as Star requested it to do in the May 15, 2015 letter.

## II.

Plaintiff Star now moves for summary judgment as to all pending claims. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## A.

Plaintiff Star first moves for summary judgment as to its breach of contract claim. To prove a breach of contract under Michigan law, a movant must establish by a preponderance of

the evidence that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.,* 848 N.W.2d 95, 104 (Mich. 2014). Through the purchase agreement, Hartwick agreed that "the system described above must meet the performance as listed above.  As well the system must run as well or better than existing equipment in the same price range.  If not we (Hartwick System) will remove the system and return all funds paid." *See* Quote #6700.  Star alleges that Hartwick breached the parties' purchase agreement because the System that did not achieve a fill rate of 10 bags per minute and did not fill each bag within three to four ounces of the specified weight. Star alleges that Hartwick then further breached the purchase agreement by failing to remove the system and return Star's payments.

Defendant Hartwick does not dispute that the System did not perform as required under the contract, nor does it dispute that Star has incurred damages as a result. *See* B. Hartwick Dep. 127.  Defendant argues, however, that Star did not provide it with enough time to install, fine-tune and modify the complex, customized System. *See* Resp. to Summ. J. 14-16. Citing *National Cash Register v. Adell*, 225 N.W. 2d 785, 787 (Mich. App. 1975), Hartwick argues that a party does not breach a contract simply because a complex product requires some service. *Adell*, however, does not directly address the breach of contract issue presented here. The question presented in *Adell* was whether a system's deficiencies constituted a breach of an implied warranty of fitness for a particular purpose. *Id.* That distinction aside, *Adell* explicitly holds that if a machine's malfunctioning is continuous even after the breaching party is given a reasonable opportunity to cure defects, the machine cannot be considered fit for is intended purpose.

Here Star had no obligation to allow Hartwick the right to cure under §§ 440.2608(1)(b) and 440.2508 because the System's nonconformities substantially impaired the System's value to

Star and because Hartwick's assurances reasonably induced Star to accept the System (as discussed in detail in II.E. supra). Nonetheless Plaintiff Star provided Hartwick with almost 90 days to cure the System's continuing, material defects after Hartwick had already had over a year to design, build, and test the System.   The System's defects were material to the parties' contractual agreements, specifically the agreement requiring the System to cycle bags at a rate of 10 per minute.   Throughout negotiations and installations, Star repeatedly emphasized the importance of having the System achieve the required cycle speed.   Defendant Hartwick has conceded that the System did not achieve the required cycle speed.   *See* B. Hartwick Dep. 127. As of September 17, 2015 Hartwick conceded that the bagging rate was a mere 5.5 bags per minute, or barely half of the required rate. *See* Mot for Summ. J., Ex. 26. Hartwick also does not dispute that the System continued to dust product, diverge from the permissible weight deviations, and experience clamping and sealing issues. No principle of law required Star to grant Hartwick unlimited time to tinker with the materially defective System.

Hartwick also argues that it made a good faith effort to perform under the contract, and that Star's own employee's caused some System issues, such as a clogged hose and a deleted programming "recipe."   Hartwick makes no argument, however, that these minor mistakes contributed in any way to the System's failure to achieve the required cycle time or the failure to consistently fill the bags at the required weights. Moreover, the claim that Hartwick made a good faith effort to meet the standards set forth in the parties' contract has no bearing on the fact that the System did not in fact meet its contractual requirements.

Having set a specific standard of performance for itself through the purchase agreement, Hartwick was required to either meet that standard or remove the system and return Star's payments.   Not only did the System fail to meet the performance standards required by the

agreement, but Hartwick then failed to remove the system and return all funds it had received from Star, as required by the agreement. Both of these failures were material breaches of the parties' purchase agreement. Summary judgment will accordingly be granted in favor of Star as to its breach of contract claim.

## B.

Star's motion for summary judgment as to Hartwick's counter-claim for breach of contract will similarly be granted. Under Michigan law a contracting party that first breaches a contract may not sue the other contracting party for breach of contract if the first party's breach was material to the contract. *See Pletos v. Lake in Woods Homeowners Ass'n*, No. 319087, 2015 WL 1650803, at *16 (Mich. Ct. App. Apr. 14, 2015) (citing *Flamm v. Scherer*, 198 N.W. 2d 702 (Mich. App. 1972). By delivering and installing a System that did not conform to the contract's essential performance terms, Hartwick committed a material breach. Hartwick therefore cannot maintain a breach of contract claim against Star for subsequently withholding the final payment.

## C.

Plaintiff Star next moves for summary judgment on its claim that Hartwick breached an express warranty. Hartwick's sale of the System to Star is a sale of goods governed by the Uniform Commercial Code ("UCC"), codified under Michigan law as Michigan Compiled Laws § 440.2101 *et seq.* A seller may create an express warranty if "[a]n affirmation of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Mich. Comp. Laws § 440.2313(1)(a). A seller need not "use formal words such as 'warrant' or 'guarantee'" nor must a seller state a specific intention to make a warranty. Mich. Comp. Laws § 440.2313(2).

The purchase agreement between the parties provides that "the system described above must meet the performance as listed above.  As well the system must run as well or better than existing equipment in the same price range.  If not we (Hartwick System) will remove the system and return all funds paid." *See* Quote #6700.   Performance requirements identified in the agreement include the specification that the System cycle at 10 bags per minute and fill bags within three to four ounces of the desired weight. *Id*. at pp. 1, 5, 30.   These performance requirements are express warranties that Hartwick did in fact breach.  Star will therefore be granted summary judgment as to its breach of express warranty claim.

**D.**

Star will also be granted summary judgment as to its claim that Hartwick breached an implied warranty that the System be merchantable.  Under § 440.2314, unless properly modified, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Mich. Comp. Laws. § 440.2314(1).   To be considered "merchantable", goods must be "fit for the ordinary purposes for which such goods are used" and "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved".   Mich. Comp. Laws § 440.2314(2). "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified… an implied warranty that the goods shall be fit for such purpose." Mich. Comp. Laws § 440.2315.

Hartwick makes no argument that the implied warranty of merchantability was excluded or modified pursuant to § 440.2316.  Nor does Hartwick argue that the System was fit for the ordinary purpose of which it was to be used, or that it did not know of the System's intended

purpose. Instead, Hartwick argues that the implied warranty of merchantability had not *yet* been breached because there were additional upgrades that Hartwick could have attempted in order to bring the System up to the performance standards specified by the purchase agreement.   In support of this argument, Hartwick relies on *Fargo Machinery & Tool Company v. Kearney and Trecker Corporation*, 428 F. Supp. 364, 370 (E. D. Mich. 1977) and *Admiral Construction and Maintenance, Inc., v. Cummins, Inc.,* 527 F. App'x 499, 502 (6th Cir. 2013).

Neither case cited by Defendant is relevant or instructive.   In *Fargo Machinery* the parties expressly disclaimed any implied warranty of merchantability pursuant to § 440.2316. *See Fargo Mach.*, 428 F. Supp. at 371-72.   In *Admiralty Construction* there was no claim that there had been a breach of an implied warranty of merchantability. *Admiralty Const.*, 527 F. App'x at 502-503.   Instead, that case involved only two claims: (1) that the seller of a vehicle had breached an express warranty to repair any engine failures resulting from normal use and service, material defects, or factory workmanship; and (2) that the engine repair warranty failed in its essential purpose.   *Id*.   *Admiralty Construction* is further distinguishable as in that case there was evidence that the buyer of the truck at issue was able to operate the truck at full functionality between engine repairs.   Here, Hartwick makes no allegation that the System ever functioned up to the standards warranted in the purchase agreement. On the contrary, Hartwick concedes that the System never achieved the required 10 bags per minute.   *See* B. Hartwick Dep. 127.

Hartwick does not rebut Star's claims that Star purchased the System in order to save on production costs, that Star intended to use the System to bag flour and bran products, among others, and that Star was relying on Hartwick's experience and judgment in selecting it to furnish such a System. *See* M.C.L. § 440.2315. By failing to deliver a System that was fit for Star's

intended purpose, Hartwick breached the implied warranty of merchantability.   Summary judgment will therefore be granted in favor of Star on its breach of implied warranty claim.

**E.**

Plaintiff Star also moves for summary judgment on its revocation claim. The UCC provides as follows:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
> > (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> >
> > (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Mich. Comp. Laws § 440.2608(1).  The Michigan Court of Appeals has held that nonconformity under this section is a failure of the goods sold to conform to legitimate expectations arising from the contract.  *See Davis v. LaFountaine*, 719 N.W.2d 890 (Mich. Ct. App. 2006). "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects."  Mich. Comp. Laws § 440.2608(2). Revocation only becomes effective when the buyer notifies the seller of it. *Id.*  Star alleges that its revocation falls under the second provision of § 440.2608(1) because it was reasonably induced to accept the System based on the difficulty of discovery prior to installation and by Hartwick's assurances regarding the System's performance.

**i.**

Hartwick does not dispute that the System did not conform to the legitimate expectations arising from the contract, or that the nonconformity would have substantially impaired the

- 18 -

System's value to Star. Hartwick also acknowledges that Star attempted to revoke acceptance of the purchase agreement on May 15, 2015.  Hartwick argues, however that Star's attempt at revoking the acceptance was rendered ineffective by Star's continued use of the System. After a buyer rejects goods that he has taken physical possession of, "he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them."  Mich. Comp. Laws § 440.2602(2)(b).  The buyer has no further obligations with regard to the goods. Mich. Comp. Laws § 440.2602(2)(c).

Normally, a buyer's continued exercise of ownership over rejected goods or units following rejection is wrongful as against the seller. Mich. Comp. Laws § 440.2602(2)(a). "Revocation of acceptance under the [UCC], however, does not impose an absolute bar to continued use of the goods, as did recission, since, under certain circumstances, it may be the only reasonable way to mitigate damages." *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 378 (E.D. Mich. 1977) (citing *Minsel v. El Rancho Mobile Home Ctr., Inc.*, 32 Mich. App. 10, 188 N.W.2d 9 (1971) (continued use of rejected mobile home did not constitute waiver of revocation as a matter of law where the seller failed "(1) to contact plaintiffs in connection with the removal, (2) to show how the delay prejudiced them, (3) to show that the delay could have been avoided.")).

Here Star attempted to revoke acceptance of the System by a letter dated May 15, 2015. Despite being informed that Star wished it to return the money paid and remove the System Hartwick did not do so.  Instead of accepting Star's revocation, Hartwick attempted to offer additional modifications, which were rejected by Star.  *See* B. Hartwick Aff. ¶7. There is no evidence that Star retracted its requests for Hartwick to refund payment and remove the System pursuant to § 440.2611, or that Hartwick unsuccessfully attempted to refund payment or remove

the system.  Hartwick concedes that Star decided to purchase a replacement packing system from a competitor in or around June of 2015. *See* Resp. to Summ. J. 13.  As of the date Star filed its reply on May 19, 2016, Star's replacement system remained on order. *See* Reply to Summ. J. 7. In the meantime, Star continues to have customer orders that it needs to fill.  By failing to fill such orders, Star would accumulate additional damages.

Even considering the facts in a light most favorable to Hartwick, Star's motion for summary judgment as to its revocation of acceptance claim must be granted.  Hartwick has presented no evidence that it ever attempted to contact Plaintiff Star in connection with removal. Hartwick has also presented no evidence that Star's continuing use of the goods prejudiced or damaged Hartwick in any way, or that Star's delay in obtaining a replacement system could be avoided.  Following Hartwick's refusal to honor Star's revocation, it appears from the evidence that continued use of the System is the only reasonable way for Star to mitigate damages while it awaits a new system.

### ii.

Hartwick also argues that Star's revocation was ineffective because Hartwick was entitled to additional time to cure the System's defects. This argument is also unavailing. A seller's right to cure non-conforming goods is governed by § 440.2508, which provides as follows:

> (1) Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
>
> (2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

*Id.* The Michigan Court of Appeals has held, however, that "a seller has no right to cure a defect that was not discoverable when the buyer accepted the goods." *Head v. Phillips Camper Sales & Rental, Inc.,* 593 N.W.2d 595, 600 (Mich. App. 1999). Because Star revoked the purchase agreement under § 440.2608(1)(b), the "right to cure" provisions of § 440.2508 do not apply.

**F.**

Finally, Plaintiff Star moves for summary judgment on Hartwick's claims on quantum meruit and unjust enrichment. Unjust enrichment is a common law remedy whereby the law implies a contract in order to prevent unjust enrichment, specifically when one party inequitably receives and retains a benefit from another. *See Martin v. East Lansing School Dist.*, 483 N.W.2d 656 (Mich. Ct. App. 1992). To proceed on a claim of unjust enrichment or quantum meruit, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *See Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898 (Mich. Ct. App. 2006); *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1993). "However, a contract will be implied only if there is no express contract covering the same subject matter." *See Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271 (Mich. Ct. App. 2003). In other words, the law will not imply a contract where there is an express contract between the same parties on the same subject matter. *Morris Pumps,* 729 N.W.2d at 904 (quoting 42 CJS IMPLIED AND CONSTRUCTIVE CONTRACTS § 34, p. 33).

Because the purchase agreement expressly governs Hartwick's obligation to refund payment to Star if the System did not meet the required performance standards, Hartwick cannot avoid its written obligation by implied contract. *See Belle Isle*, 666 N.W.2d at 281 (concluding that a plaintiff could not recover costs of improvement by implied contract where his lease expressly provided for capital improvements in lieu of rent). *See also Liggett Restaurant Group,*

*Inc. v. City of Pontiac*, 676 N.W.2d 633, 639 (Mich. Ct. App. 2003) (holding that the trial court properly dismissed the plaintiff's unjust enrichment claim where there was an express provision in the parties' contract contemplating the subject matter of the dispute); *Fodale v. Waste Mgmt. of Mich., Inc.*, 718 N.W.2d 827, 841 (2006) (holding that a plaintiff was foreclosed from bringing an unjust enrichment claim where an express contract governed the parties' loan).

Hartwick nonetheless argues that, because Star did not properly revoke its acceptance or reject the System, under § 440.2607 Star is required to pay the full contract price. As explained above, however, Star properly revoked acceptance by its May 15, 2015 letter. Hartwick's argument is therefore without merit.

Hartwick also argues that its quantum meruit and unjust enrichment relate only to the wrapper component of the system, which was specifically excluded from the System's performance requirements. There is nothing in Hartwick's pleadings that limit application of its quantum meruit and unjust enrichment counterclaims to the wrapper component. Nor did Hartwick ever attempt to amend its counterclaims in order to place Star on notice that the application of the counterclaims was limited to the wrapper component. Hartwick may not recharacterize its counterclaims for the first time in a response to a motion for summary judgment. *See Tucker v. Union of Needletrades, Indus. & Textile Employees,* 407 F.3d 784, 786 (6th Cir. 2005). Star's motion for summary judgment will be granted.

### III.

Plaintiff Star also moves for partial summary judgment as to damages in the amount of $1,123,394. Star alleges that this amount constitutes the undisputed purchase price of the System ($556,086), installation costs ($191,006), retrofitting of the Quincy facility ($147,319), freight costs from Frankenmuth to Quincy ($171,566), and increased labor costs ($57,417). In its

- 22 -

response Hartwick does not address Star's partial claim for damages. Because Hartwick has not identified any material factual disputes regarding the alleged damages, partial summary judgment will be granted in favor of Star.

## IV.

Accordingly, it is **ORDERED** that Plaintiff Star's motion for summary judgment against Defendant Hartwick Sales, ECF No. 12, is **GRANTED**, as to liability on all claims and counterclaims and partial damages in the amount of $1,123,394.

It is further **ORDERED** that the remaining issues will proceed to trial in accordance with the dates and deadlines set forth in the Case Management and Scheduling Order, ECF No. 8.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 14, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 14, 2016.

s/Julie Owens
JULIE OWENS, Case Manager
Acting in the absence of Michael Sian

---

- 23 -